Filed 5/24/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| | ) | |
| | ) | |
| DELANO FARMS COMPANY et al., | ) | S226538 |
| Plaintiffs and Appellants, | ) | |
| | ) | |
| v. | ) | Ct.App. 5 F067956 |
| | ) | |
| CALIFORNIA TABLE GRAPE | ) | County of Fresno |
| COMMISSION, | ) | Super. Ct. Nos. 636636-3, 642546, |
| Defendant and Respondent. | ) | 01CECG01127, 01CECG02292, |
| | ) | 01CECG02289, 11CECG00178 |
| _____ | ) | |

Pursuant to the Ketchum Act (Food & Agr. Code, § 65500 et seq.; sometimes hereafter referred to as the Act), the activities of the California Table Grape Commission (sometimes hereafter referred to as the Commission) are funded by assessments on shipments of California table grapes. Plaintiffs and appellants are five growers and shippers of these grapes. They contend that the collection of assessments under the Act to subsidize promotional speech on behalf of California table grapes as a generic category violates their right to free speech under article I, section 2, subdivision (a) of the state Constitution (sometimes hereafter article I, section 2). Specifically, plaintiffs believe that the table grapes they grow and ship are exceptional, and cast the assessment scheme as infirm insofar as it requires them to sponsor a viewpoint (promoting all California table grapes equally) with which they disagree.

1

The Commission responds that the Act's compelled-subsidy program does not violate article I, section 2 because the promotional messaging it underwrites represents government speech, as opposed to private speech. Both the Commission's position and that of plaintiffs recognize this court's prior determinations that a government program that compels market participants to subsidize generic promotional speech over their objections implicates article I, section 2 (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 509-510 (*Gerawan I*)) and is subject to intermediate scrutiny (*Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 6 (*Gerawan II*)) — if these communications represent *private* speech. *Gerawan II* also indicated, however, that significantly more deference would be accorded to a compelled-subsidy scheme that funds only *government* speech. (*Id*., at pp. 26-28.) In *Gerawan II*, whether the challenged program produced government speech was left for development and determination on remand. (*Id*., at p. 28.) This proceeding picks up where *Gerawan II* left off, presenting the question whether promotional speech generated by a compelled-subsidy program amounts to government speech and for that reason avoids heightened scrutiny under article I, section 2.

We conclude that the Commission's advertisements and related messaging represent government speech, and hold that the Ketchum Act's compelled-subsidy scheme does not violate plaintiffs' rights under article I, section 2. The government speech doctrine recognizes that a properly functioning government must express potentially controversial viewpoints as a matter of course, and that payers of taxes and fees may be required to subsidize this speech, even when they disagree with it, without implicating their constitutional right to free speech. Yet, as the United States Supreme Court recently cautioned, although "the government-speech doctrine is important — indeed, essential — it is a doctrine that is susceptible to dangerous misuse." (*Matal v. Tam* (2017) 582 U.S. ___ [137 S.Ct. 1744, 1758] (*Matal*).) Therefore, courts must take care in distinguishing government speech from private speech, and apply the government

speech doctrine in a manner mindful of its potential impact on protected free speech interests.

Here, the relevant circumstances establish sufficient government responsibility for and control over the messaging at issue for these communications to represent government speech that plaintiffs can be required to subsidize without implicating their rights under article I, section 2.  Meanwhile, no triable issue of fact exists that the Ketchum Act violates plaintiffs' article I, section 2 rights under a different theory, such as one asserting that the statute's compelled-assessment scheme effectively prevents them from speaking.  Accordingly, we hold that plaintiffs have advanced no viable claim under article I, section 2.  Because the Court of Appeal rejected plaintiffs' challenge to the Ketchum Act on similar grounds, we affirm the judgment below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

California leads the nation in the production of agricultural commodities, with its farms and ranches generating more than $47 billion in value in the 2015 crop year.  (Cal. Dept. of Food and Agriculture, California Agricultural Statistics Review 2015-2016 (2017) pp. 1-2 (Agricultural Statistics Review).)  Table grapes are among the agricultural products for which this state is well known.  Table grapes are distinguished from other types of grapes, such as raisin grapes and wine grapes, in that they are generally eaten while fresh instead of being consumed only after being dried or turned into wine.  (See Food & Agr. Code, § 65523.)[1]  This opinion therefore sometimes refers to table grapes as "fresh grapes."  The 2015 harvest of California table grapes had an estimated total value in excess of $1.7 billion.  (Agricultural Statistics Review, at p. 12.)  The parties have stipulated that as of 2012, there were approximately 475 growers of table grapes in California.

---

[1]    All subsequent statutory references are to the Food and Agricultural Code unless otherwise noted.

3

**A. The Ketchum Act and Its Implementation**

The Ketchum Act responded to challenging market conditions encountered by the state's producers of fresh grapes in the 1960s.[2] As will be explained in more detail below, the Act created the California Table Grape Commission, a public corporation vested with the power and duty to engage in activities intended to increase consumer demand for California fresh grapes. These activities are funded by assessments imposed upon shippers of these grapes, which are passed along to their producers.

*1. Legislative Findings*

The Ketchum Act begins with a series of findings by the Legislature. Several of these findings concern the importance assigned to the production and marketing of California fresh grapes, and the challenges faced by growers of these grapes. These findings include, "[g]rapes produced in California for fresh . . . consumption comprise one of the major agricultural crops of California, and the production and marketing of such grapes affects the economy, welfare, standard of living and health of a large number of citizens residing in this state" (§ 65500, subd. (a)); and "[i]ncreased plantings of vineyards and improved cultural practices for the production of California grapes for

---

[2] The Ketchum Act, enacted in 1967, revived the Commission, which was first established pursuant to a statute enacted in 1961. (Stats. 1961, ch. 1391, § 1, p. 3167, repealed by Stats. 1967, ch. 15, § 1, p. 44.) Like the Ketchum Act, the 1961 statute responded to difficult market conditions by creating a California Table Grape Commission and vesting this agency with authority to promote fresh grapes through advertisements and other promotional efforts, to be paid by assessments imposed on market participants. (See former Agr. Code, §§ 5500, 5572, 5600.) The state's fresh grape producers failed to timely ratify this law through the statute's referendum procedure, however, which led to the suspension and winding down of the Commission's operations. (Foytik, Agricultural Marketing Orders: Characteristics and Use in California, 1933-1962 (1962) p. 66.) The provisions of the 1961 law diverged from the Ketchum Act's terms in certain respects. Among these differences, the 1961 law provided that "no action of the [C]ommission, or any member thereof . . . shall be valid unless first approved by the director" (now Secretary) of what was then the Department of Agriculture, now the Department of Food and Agriculture. (Former Agr. Code, § 5572.) No comparable provision appears in the Ketchum Act.

4

fresh . . . consumption have increased and will continue to increase the production thereof and unless the fresh . . . consumption of California grapes is increased by the expansion of existing markets and the development of new markets, the interests of the fresh grape industry of California, and the public interest of the people of this state, will be adversely affected" (*id*., subd. (b)). Furthermore, the Legislature found that "[t]he inability of individual producers to maintain or expand present markets or to develop new or larger markets for such grapes results in an unreasonable and unnecessary economic waste of the agricultural wealth of this state" (*id*., subd. (c)); and "[s]uch conditions and the accompanying waste jeopardize the future continued production of adequate supplies of fresh grapes for human consumption for the people of this and other states, and prevent producers from obtaining a fair return for their labor, their farms and their production. As a consequence, the purchasing power of such producers has been in the past, and may continue to be in the future unless such conditions are remedied, low in relation to that of other people engaged in other gainful occupations within the state, and they are thereby prevented from maintaining a proper standard of living and from contributing their fair share to the support of the necessary governmental and education functions, thus tending to increase unfairly the tax burden of other citizens of the state" (*id*., subd. (d)).

Other findings relate the state's response to these challenging conditions, endorsing measures perceived as developing and expanding markets for California fresh grapes. These findings provide, "The[] [aforementioned] conditions vitally concern the health, peace, safety and general welfare of the people of this state. It is therefore necessary and expedient in the public interest to protect and enhance the reputation of California fresh grapes for human consumption in intrastate, interstate and foreign markets, and to otherwise act so to eliminate unreasonable and unnecessary economic waste of the agricultural wealth of this state" (*id*., subd. (e)); "[t]he promotion of the sale of fresh grapes for human consumption by means of advertising, dissemination of information on the manner and means of production, and the care and effort required in

5

the production of such grapes, the methods and care required in preparing and transporting such grapes to market, and the handling of the same in consuming markets, research respecting the health, food and dietetic value of California fresh grapes and the production, handling, transportation and marketing thereof, the dissemination of information respecting the results of such research, instruction of the wholesale and retail trade with respect to handling thereof, and the education and instruction of the general public with reference to the various varieties of California fresh grapes for human consumption, the time to use and consume each variety and the uses to which each variety should be put, the dietetic and health value thereof, all serve to increase the consumption thereof and to expand existing markets and create new markets for fresh grapes, and prevent agricultural waste, and [are] therefore in the interests of the welfare, public economy and health of the people of this state" (§ 65500, subd. (f)); "[i]t is hereby declared to be the policy of this state to aid producers of California fresh grapes in preventing economic waste in the marketing of their commodity, to develop more efficient and equitable methods in such marketing, and to aid such producers in restoring and maintaining their purchasing power at a more adequate, equitable and reasonable level" (*id.*, subd. (g)); and "[t]he production and marketing of grapes produced in California for fresh human consumption is declared to be affected with a public interest; the provisions of this chapter are enacted in the exercise of the police power of this state for the purpose of protecting the health, peace, safety and general welfare of the people of this state" (*id.*, subd. (h)).

### 2. *The California Table Grape Commission*

The Act created the California Table Grape Commission to effectuate the policies set forth in the statute's findings. (§ 65550.)[3] The Commission is a public corporation.

---

[3] State law recognizes multiple frameworks for collective marketing within the agriculture sector. The two most commonly utilized are marketing orders — the subject

of our decisions in *Gerawan I*, *supra*, 24 Cal.4th 468, and *Gerawan II*, *supra*, 33 Cal.4th 1 — and commissions.

Under state law, marketing orders are issued pursuant to the California Marketing Act of 1937. (§ 58601 et seq.; sometimes hereafter referred to as the CMA.) This statute authorizes the Secretary of the Department of Food and Agriculture (sometimes hereafter referred to as the Secretary; the Department of Food and Agriculture is sometimes referred to as the CDFA) to issue marketing orders pertaining to specific agricultural commodities. (§ 58741.) These orders may provide for production limits (§ 58883), grading standards (§ 58888), research studies (§ 58892), and advertising and sales promotion (§ 58889), among other subjects. In general, any provision within a marketing order concerning advertising and sales promotion "shall be directed toward increasing the sale of the commodity without reference to any private brand or trade name that is used by any handler with respect to the commodity regulated by the marketing order." (*Id.*, subd. (b).) As with the scheme prescribed by the Ketchum Act, funding for activities under a marketing order comes from assessments on producers or handlers of the commodity subject to the order. (§ 58921.)

The governance of a marketing order is somewhat different from that associated with actions undertaken by a commission. Each marketing order must provide for the establishment of an advisory board to assist the Secretary in the administration of the order. (§ 58841.) Members of an advisory board are appointed by, and serve at the pleasure of the Secretary. (*Ibid.*) Except for a member who may be appointed to represent "the department or the public generally" (§ 58843), members of an advisory board must be involved in the production or handling of the subject commodity (§ 58842). An advisory board's duties are "administrative only." (§ 58846.) Among its responsibilities, an advisory board may, "[s]ubject to the approval of the [Secretary], administer the marketing order," and "[r]ecommend to the [Secretary] administrative rules and regulations which relate to the marketing order." (*Id.*, subds. (a), (b).)

Commissions were developed as an alternative to marketing orders. In addition to the California Table Grape Commission, other commissions that have been authorized by statute include the California Iceberg Lettuce Commission (§ 66501 et seq.); the California Rice Commission (§ 71000 et seq.); the California Wine Commission (§ 74501 et seq.); the California Egg Commission (§ 75001 et seq.); the California Sheep Commission (§ 76201 et seq.); the California Forest Products Commission (§ 77501 et seq.); the California Sea Urchin Commission (§ 79000 et seq.); the California Nursery Producers Commission (§ 79401 et seq.); the California Apiary Research Commission (§ 79601 et seq.); and the Olive Oil Commission of California (§ 79800 et seq.), among many others.

The terms of the statutes that have created these and other commissions and vested them with authority vary in some respects from the provisions of the Ketchum Act. One difference is that other statutes commonly provide for a different form of engagement by the CDFA with the relevant commission's activities, from that contemplated under the

7

(§ 65551.) Its membership consists of three producers from each of the state's six operational fresh grape growing districts (§§ 65533, 65550, 65554), as well as one "public" member not engaged in the production, shipment, or processing of fresh grapes in this state (§ 65575.1). The Legislature has determined that the commissioners drawn from the state's producers "are intended to represent and further the interest of a particular agricultural industry concerned, and that such representation and furtherance is intended to serve the public interest." (§ 65576.) The public member "shall represent the interests of the general public in all matters coming before the commission." (§ 65575.2.)

After the Commission's inception and initial elections, producers have been selected for service on the Commission through a two-part process. First, each year each district conducts an election in which the district's qualified grape producers cast votes. (§ 65556.) The Secretary of the Department of Food and Agriculture then tabulates these votes, identifies the two leading vote-getters, and appoints one of these two nominees as a member of the Commission. (§ 65563.) The public member of the commission, meanwhile, is selected by the Secretary from a list of three nominees proposed by the Commission. (§ 65575.1.) If the Secretary disapproves of all nominees for the public member position, "the [C]ommission shall continue to submit lists of nominees until the [Secretary] has made a selection." (*Ibid.*) Each commissioner serves a three-year term. (§ 65555.)

---

Ketchum Act. (E.g., § 66561.3 [authorizing the Secretary to require the California Iceberg Lettuce Commission "to correct or cease any activity or function which is determined by the [Secretary] not to be in the public interest or is in violation of" that commission's authorizing statute].)

### 3. The Commission's Powers and Duties

The Ketchum Act confers upon the Commission "powers and duties" (§ 65572) that include responsibility to "administer and enforce [the Act], and to do and perform all acts and exercise all powers incidental to or in connection with or deemed reasonably necessary, proper or advisable to effectuate the purposes of" the Act. (§ 65572, subd. (c).) The Commission may hire officers and other personnel to assist with these responsibilities. (*Id*., subd. (d).)[4] The Act specifically vests the Commission with the "power[] and dut[y] . . . [¶] . . . [¶] . . . [t]o promote the sale of fresh grapes by advertising and other similar means for the purpose of maintaining and expanding present markets and creating new and larger intrastate, interstate, and foreign markets for fresh grapes; to educate and instruct the public with respect to fresh grapes; and the uses and time to use the several varieties, and the healthful properties and dietetic value of fresh grapes." (§ 65772, subd. (h).) In the Commission's discretion, it also may "educate and instruct the wholesale and retail trade with respect to proper methods of handling and selling fresh grapes; . . . arrange for the performance of dealer service work providing display and other promotional materials; . . . make market surveys and analyses; and . . . present facts to and negotiate with state, federal and foreign agencies on matters which affect the marketing and distribution of fresh grapes; and . . . undertake any other similar activities which the [C]ommission may determine appropriate for the maintenance and expansion of present markets and the creation of new and larger markets for fresh grapes." (*Id*., subd. (i).) The Commission also is authorized to "conduct, and contract with others to conduct, scientific research . . . respecting the marketing and distribution of fresh grapes, the production, storage, refrigeration, inspection and transportation thereof, to develop and discover the dietetic value of fresh grapes and to develop and expand markets, and to

---

[4]     As of July 2012, when the Commission moved for summary judgment, it had 22 employees.

improve cultural practices and product handling so that the various varieties may be placed in the hands of the ultimate consumer in the best possible condition." (*Id*., subd. (k).) These and other provisions of the Act are to be "liberally construed." (§ 65674.)

To pay for the Commission's activities, the Act authorizes an assessment on shipments of fresh grapes. This assessment is set annually by the Commission, but by statute may not exceed .6522 cents per pound of shipped grapes. (§§ 65572, subd. (*l*), 65600.) These assessments are paid to the Commission by shippers, each of which is in turn authorized to collect the assessments from the responsible producers. (§§ 65604, 65605.) In the event of nonpayment of an assessment, or if the Commission believes a violation of the Act, or any rule or regulation promulgated under the Act, has occurred, it may bring an action in its name for collection, civil penalties, or injunctive relief. (§ 65650.) Violations of the Act, including a shipper's refusal to supply the Commission with certain information regarding its supplier or suppliers of grapes, are punishable as misdemeanors. (§ 65653.) The Act provides that "[t]he State of California shall not be liable for the acts of the [C]ommission or its contracts." (§ 65571.)

The Commission assumed its responsibilities under the Ketchum Act only after a referendum among producers. (§ 65573.) The Commission's operations may be suspended through a similar process. If 11 members of the Commission make a finding that the Act "has not tended to effectuate its declared purposes," or 20 percent of producers file a petition with the Secretary requesting suspension of the Commission's activities, the Secretary shall cause a producer referendum to be conducted. (§ 65660.) If a sufficient number of producers participate in this referendum and vote for suspension, "the [Secretary] shall declare the operation of the provisions of [the Act] and of the [C]ommission suspended, effective upon expiration of the marketing season then current." (§ 65661.) Furthermore, the Act provides for a referendum among producers every five years to determine whether the Commission's operations will continue.

10

(§ 65675.) To date, all of these referenda have led to the continuation of the Commission and its operations.

### 4. *The Commission's Activities Under the Act*

The Commission divides its activities into five general categories — research, trade management, issues management, advertising, and education and outreach.[5] Since the Commission's inception, its programmatic efforts have included facilitating the opening of new international markets for California table grapes, funding and implementing research efforts to produce new varieties of table grapes and develop improved pest-control practices, promoting the use of table grapes among food service providers and in home cooking, collaborating with retailers to enhance the presentation and sale of fresh grapes to consumers, and developing generic advertising that promotes the consumption of California fresh grapes.

The Commission's advertising appears in print media and on radio, television, and the Internet. This advertising does not specify or endorse any one type of California fresh grape or any single producer of these grapes. Instead, it promotes California fresh grapes in general as being flavorful, convenient, and healthful. The Commission's advertising has not promoted any products other than California fresh grapes. Past themes of Commission advertising have borne the taglines, "Good things come in bunches," "Share some California grapes," "Life is complicated. Grapes are simple," and "California grapes. The Natural Snack." These advertisements bear no express attribution to the State of California. Their recurring elements vary across media. Print advertisements include the Commission's website address and its logo, which reads "Grapes from California."

---

[5] Per the record developed below, in 2010-2011, the last fiscal year for which data appear in the record, the Commission spent $1,902,770 in assessment funds on research activities, $1,352,222 on trade management, $1,375,654 on issue management, $2,103,311 on paid advertising, and $1,949,374 on education and outreach.

### 5. *Oversight of the Commission*

By all accounts, neither the Secretary nor her employees have directly participated in the development or approval of the Commission's advertising, or other promotional speech by the Commission. The Department of Food and Agriculture's "Policies for Marketing Programs" manual, the pertinent provisions of which are not captured in any promulgated regulation, states that the "CDFA reserves the right to exercise exceptional review of advertising and promotion messages wherever it deems such review is warranted," which "may include intervention in message development prior to placement of messages in a commercial medium or venue." This manual also relates the Department's expectation that advertising and promotional messages be "[t]ruthful," "[i]n good taste," "[n]ot disparaging," and "[c]onsistent with statute."

The Ketchum Act incorporates a mechanism to challenge Commission actions, providing that "[a]ny person aggrieved by any action of the [C]ommission" may appeal that action to the Secretary. (§ 65650.5.)[6] The Secretary "shall review the record of the proceedings before the [C]ommission." (*Ibid*.) Upon such review, the Secretary shall dismiss the appeal if she finds that the Commission's action "was not an abuse of discretion or illegal," but may reverse the Commission's action if it was "not substantially sustained by the record, was an abuse of discretion, or illegal." (*Ibid*.) Any decision by the Secretary dismissing an appeal or reversing an action of the Commission is subject to judicial review upon petition of the Commission "or any party aggrieved by the decision." (*Ibid*.) This appeal mechanism has been invoked in the past, leading to the Secretary's reversal of a Commission action, albeit not in the context of advertising or other promotional speech.

---

[6]    The Act refers to the Secretary of the CDFA as the "Director," the Secretary's former title. (See § 50.)

12

As another form of oversight, the Act provides that the Commission must "keep accurate books, records and accounts of all of its dealings," which "shall be open to inspection and audit by the Department of Finance . . . or other state officer charged with the audit of operation of departments of the State of California." (§ 65572, subd. (f).)

## B. Proceedings Below

In 1999, plaintiffs Delano Farms Company (Delano Farms) and Gerawan Farming, Inc., filed separate but substantively similar complaints in Sacramento Superior Court, in which they alleged (among other claims) that the Ketchum Act's compelled-subsidy program violates their right to free speech under article I, section 2.[7] Plaintiffs Four Star Fruit, Inc., Bidart Bros., and Blanc Vineyards, LLC (Blanc Vineyards) have since joined the litigation, raising similar claims.

All plaintiffs assert that the Ketchum Act is unconstitutional insofar as it requires them to subsidize promotional speech that advances a viewpoint with which they disagree. Delano Farms and Blanc Vineyards, for example, each allege that "[t]he Commission's advertisements, promotions, and other expressive activities are largely designed to promote table grapes as though they were a generic commodity with generic quality," whereas these plaintiffs "promote and market their own brands and labels of table grapes to distinguish to [their] buyers [their] product[s], grade, quality and [their] service from that of [their] competitors in order to secure a higher price and repeat business." The other plaintiffs make analogous allegations. Plaintiffs also claim that a conflict exists between the Commission's messaging regarding fresh grapes and the message that plaintiffs support. Delano Farms and Blanc Vineyards assert that "[t]he generic advertising and promotion activities engaged in by the Commission [are] not at all helpful to [p]laintiffs and [are] indeed harmful to [p]laintiffs' message which is to buy [p]laintiffs' table grapes because they are better, a better consumer value, and that

---

[7] Plaintiffs' operative complaints also allege other violations of their constitutional rights. These allegations are not at issue at this stage of the litigation.

13

[p]laintiffs provide better service." All plaintiffs seek declaratory and injunctive relief, as well as a refund of the assessments they have paid.

After the expiration of lengthy stays pending the resolution of related litigation,[8] the Commission moved for summary judgment in 2012. In doing so, the Commission argued that the advertisements and other communications subsidized through the Ketchum Act represent government speech that plaintiffs could be required to subsidize without violating their right to free speech under article I, section 2. The Commission advanced two rationales for treating its messaging as government speech. First, it cast itself as a government agency capable of generating government speech on its own. Second, the Commission asserted that even if it was not itself a government speaker, its communications qualified as government speech because they are effectively controlled by the government. As an alternative ground for summary judgment, the Commission argued that if its advertising and other speech did not represent government speech, the Act's compelled assessment program nevertheless survived intermediate scrutiny.

The superior court granted the Commission's motion for summary judgment, reasoning that the Commission represents a government agency for purposes of the government speech doctrine. Providing an additional basis for its holding, the court determined that the Act's compelled-subsidy program directly advances a substantial government interest and is not more extensive than necessary to serve that interest, and therefore withstands intermediate scrutiny.

When plaintiffs appealed, the Court of Appeal affirmed. The Court of Appeal determined, first, that article I, section 2 does not demand a more constrained

---

[8] Those cases included federal proceedings initiated by three California table grape growers — one of which, Delano Farms, is among the plaintiffs here — that attacked the Ketchum Act's compelled-assessment program as violating their rights under the First and Fourteenth Amendments to the United States Constitution. (See *Delano Farms Co. v. California Table Grape Com'n* (9th Cir. 2009) 586 F.3d 1219.) As will be discussed in more detail *post*, that litigation concluded with the rejection of the plaintiffs' claims.

construction of the government speech doctrine than the one adopted by the United States Supreme Court in *Johanns v. Livestock Marketing Assn.* (2005) 544 U.S. 550 (*Johanns*) as a matter of federal law.  The Court of Appeal then reviewed pertinent provisions of the Ketchum Act and concluded therefrom "that the Commission's promotional activities are effectively controlled by the state and therefore are government speech."  This conclusion, the Court of Appeal reasoned, meant that the Commission's promotional activities are "immune to challenge under the California Constitution."

We granted review.

## II. DISCUSSION

This is not the first time this court has considered the relationship between article I, section 2 and the compelled subsidy of speech.  Through our previous encounters with this subject, we have concluded that a standard of intermediate scrutiny applies under article I, section 2 when the government compels the subsidization of *private* speech.  (*Gerawan II*, *supra*, 33 Cal.4th at p. 6.)  We also have indicated that greater deference would be accorded to state action that subsidizes only *government* speech.  (*Id*., at pp. 26-28.)  We have not yet determined for ourselves, however, whether a particular compelled-subsidy program in fact generates government speech under article I, section 2.

This case presents that issue, requiring us to decide whether speech developed and promulgated under the auspices of the Ketchum Act represents government speech. According to plaintiffs, the Commission — being overwhelmingly populated by market participants, each of whom is appointed by the Secretary from a pair of nominees proposed by growers themselves — is essentially a private entity incapable of generating government speech on its own.  Plaintiffs also assert that the Ketchum Act does not otherwise ensure sufficient governmental accountability to the public regarding the messaging it contemplates for these communications to qualify as government speech. Here, plaintiffs emphasize the absence of active engagement by the CDFA in the review

15

and approval of the Commission's promotional speech, and the fact that the Commission's advertisements are not explicitly attributed to the state. For its part, the Commission maintains that it is a state agency capable of generating government speech, even without oversight by the CDFA or other government actors. Furthermore, the Commission adds, the extent of governmental control over the messaging promulgated under the Ketchum Act also leads to a finding that these communications represent government speech.

In evaluating these positions, we begin with an overview of two principles this case calls upon us to mediate: the free speech guarantee enshrined in article I, section 2, and the government speech doctrine. We then review a series of decisions in which this and other courts have evaluated assertions that compelled-subsidy programs do not implicate constitutional free speech protections because they subsidize only government speech. Applying principles gleaned from the relevant precedent to the communications authorized by the Ketchum Act, we conclude that the promotional messaging under the Act constitutes government speech.

### A. Article I, Section 2

Article I, section 2 of the California Constitution contains our state's counterpart to the free speech provision found in the First Amendment to the United States Constitution. Article I, section 2, subdivision (a) declares, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."[9]

This court has held that the free speech guarantee within article I, section 2 " 'is "at least as broad" as [citation] and in some ways is broader than [citation] the

---

[9]    A substantively identical provision formerly appeared at article I, section 9 of the state Constitution. (See *DeGrassi v. Cook* (2002) 29 Cal.4th 333, 339 [explaining that article I, section 2, subdivision (a) "was added to the state Constitution through Proposition 7 on the November 1974 ballot," prior to which the state Constitution had "long contained a substantively identical clause set out in former article I, section 9"].)

comparable provision of the federal Constitution's First Amendment.'  [Citation.]  Unlike the First Amendment, California's free speech clause 'specifies a "right" to freedom of speech explicitly and not merely by implication,' 'runs against . . . private parties as well as governmental actors' and expressly 'embrace[s] all subjects.'  [Citation.]  However, '[m]erely because our provision is worded more expansively and has been interpreted as more protective than the First Amendment . . . does not mean that it is broader than the First Amendment in all its applications.'  [Citation.]"  (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 341 (*Beeman*); see also *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 168.)  Furthermore, although the state Constitution is an independent source of fundamental rights (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 365; see also Cal. Const., art. I, § 24), "our case law interpreting California's free speech clause has given respectful consideration to First Amendment case law for its persuasive value" (*Beeman*, 58 Cal.4th at p. 341).  Thus, in appropriate situations we have construed article I, section 2 in a manner congruent with prevailing interpretations of the First Amendment.  (See, e.g., *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 959-963.)

## B.  Government Speech

Although individuals have a right to speak freely, they do not have the right *not* to fund *government* speech.  To recognize such a right would make effective governance impossible.

"Participation by the government in the system of freedom of expression is an essential feature of any democratic society.  It enables the government to inform, explain, and persuade — measures especially crucial in a society that attempts to govern itself with a minimum use of force.  Government participation also greatly enriches the system; it provides the facts, ideas, and expertise not available from other sources.  In short, government expression is a necessary and healthy part of the system."  (Emerson, The System of Freedom of Expression (1970) p. 698.)  And when it speaks, the government

17

inevitably will express viewpoints that some members of the body politic not only disagree with, but indeed find highly objectionable. This purposive messaging represents an integral and, on the whole, beneficial part of the government's basic functioning.

These principles undergird the government speech doctrine, whereby state action that generates or constitutes government speech, rather than private speech, is regarded as outside the purview of the First Amendment to the United States Constitution.[10] (See, e.g., *Pleasant Grove City v. Summum* (2009) 555 U.S. 460, 467 (*Summum*) ["The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech"].) The doctrine also finds support in the fact that the electorate and the political process ultimately will determine what the government does and does not say. (*Board of Regents of Univ. of Wis. System v. Southworth* (2000) 529 U.S. 217, 235 ["When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position."].) As the United States Supreme Court recently explained, "When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. [Citation.] That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. [Citation.] Thus, government statements (and government actions

---

[10] Some of the intuitions behind the government speech doctrine have informed free speech jurisprudence under the First Amendment for decades. In *Board of Education v. Barnette* (1943) 319 U.S. 624 (*Barnette*), for example, the United States Supreme Court recognized that a state *could* prescribe a general public school curriculum (*id*., at p. 631), even as it held that the state *could not* require students to participate in a flag salute that involved an "affirmation of a belief and an attitude of mind" (*id*., at p. 633), upon pain of expulsion and possible treatment as a delinquent (*id*., at pp. 629-630, 642). Only more recently, however, has the government speech doctrine coalesced into a discrete theory. As previously noted, the doctrine's ongoing elaboration and significant implications have led the high court to caution against its "misuse." (*Matal*, *supra*, 582 U.S. at p. ___ [137 S.Ct. at p. 1758].)

and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. [Citation.] Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect this electoral mandate. [Citation.] [¶] Were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary?" (*Walker v. Texas Div., Sons of Confederate Veterans, Inc.* (2015) 576 U.S. ___, ___ [135 S.Ct. 2239, 2245-2246] (*Walker*); see also *Summum*, at p. 468 ["it is not easy to imagine how government could function if it lacked this freedom"].)

### C. Case Law Involving Free Speech Challenges to Compelled Subsidy Programs and the Government Speech Doctrine

The right to free speech and the government speech doctrine have intersected in prior cases in which the plaintiffs have alleged that state action has unconstitutionally compelled them to subsidize viewpoints with which they disagree. In some of these matters, the defendants have responded that the plaintiffs are paying only for government speech, rather than private speech, making the challenged action lawful. The discussion below reviews how these arguments have been presented and addressed in prior decisions by this court, as well as other courts.

#### 1. *Keller*

The United States Supreme Court's first extended discussion of the relationship between compelled subsidies and government speech occurred in *Keller v. State Bar of California* (1990) 496 U.S. 1 (*Keller*). The high court had laid the foundation for the *Keller* litigation some time before, in *Abood v. Detroit Board of Education* (1977) 431 U.S. 209 (*Abood*). There, the court reviewed a challenge brought under the First and Fourteenth Amendments to the United States Constitution to a requirement, authorized by

19

statute, that public employees pay a union fee as a condition of employment. (*Id*., at pp. 211-213.) The court in *Abood* concluded that, notwithstanding the plaintiffs' objections to the fee, the assessment was permissible to the extent that it subsidized activities that " 'promote[d] the cause which justified bringing the group together' " (*id*., at p. 223, quoting *Machinists v. Street* (1961) 367 U.S. 740, 778 (conc. opn. of Douglas, J.)), i.e., collective bargaining, contract administration, and grievance-adjustment duties undertaken by the union (*Abood*, at p. 232). However, the fee could not be extracted over the employees' objections to pay for other speech, such as "the expression of political views . . . or . . . the advancement of other ideological causes[,] not germane to [the union's] duties as collective-bargaining representative." (*Id*., at p. 235.)

The Supreme Court applied a similar analysis in *Keller*, *supra*, 496 U.S. 1. The compelled subsidy in *Keller* involved the California State Bar's exaction of compulsory dues from its members. The plaintiffs in *Keller* argued that the use of these assessments to fund political or ideological activities that they opposed violated their rights under the First and Fourteenth Amendments. (*Id*., at p. 4.)

In proceedings below, this court had rejected the bulk of the plaintiffs' free speech claim, invalidating the fee only insofar as it subsidized electioneering by the State Bar outside of its statutory authority. (*Keller v. State Bar* (1989) 47 Cal.3d 1152, 1168, 1172.) In an early application of the government speech doctrine, we reasoned that the State Bar's status as a public corporation and other aspects of its composition and treatment under state law established that it was a government agency (*id*., at pp. 1161-1164),[11] and that as a government agency, the State Bar could "use dues to finance all

---

[11]    Although our decision in *Keller v. State Bar*, *supra*, 47 Cal.3d 1152, recognized "certain similarities between a bar and a labor union which would support imposing upon the bar those restrictions which limit union expenditures," we emphasized that "[t]he California Constitution, statutes, and judicial decisions . . . appear to envision the bar as a governmental agency." (*Id*., at p. 1162.) In particular, we observed that under state law, the State Bar was a public corporation (see Cal. Const., art. VI, § 9; Bus. & Prof. Code,

activities germane to its statutory purpose, a phrase which we construe broadly to permit the bar to comment generally upon proposed legislation or pending litigation." (*Id*., at p. 1157.)

The United States Supreme Court reversed, concluding that the State Bar should not be considered a government actor in this context. The unanimous decision in *Keller*, *supra*, 496 U.S. 1, acknowledged that this court "is the final authority on the 'governmental' status of the State Bar of California for purposes of state law." (*Id*., at p. 11.) But, the high court continued, this determination of status, to the extent that it "entitled [the State Bar] to the treatment accorded a governor, a mayor, or a state tax commission, for instance, is not binding on us when such a determination is essential to the decision of a federal question." (*Ibid*.)

Significantly, the Supreme Court in *Keller*, *supra*, 496 U.S. 1, recognized that there was no broad First Amendment right *not* to fund speech by government officials and agencies. Chief Justice Rehnquist's opinion for the court observed that "[g]overnment officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If

§ 6001), and that "all other public corporations in California — water districts, school districts, reclamation districts, etc. — are clearly considered governmental entities." (47 Cal.3d at p. 1163.) We also regarded the following facts as significant: (1) the State Bar Board of Governors included six public members appointed by the Governor (*id*., at p. 1163, citing Bus. & Prof. Code, § 6013.5); (2) all of the State Bar's property had been " 'declared to be held for essential public and governmental purposes' " and was exempt from taxation (47 Cal.3d at p. 1163, quoting Bus. & Prof. Code, § 6008); (3) by statute, the State Bar's meetings were open to the public (47 Cal.3d at pp. 1163-1164, citing Bus. & Prof. Code, § 6026.5); and (4) other statutes, as construed by the courts, either appeared to consider the State Bar a government agency (47 Cal.3d at pp. 1163-1164, citing Bus. & Prof. Code, § 6001, subd. (g)) or would be constitutionally suspect if the State Bar was not considered a government agency (47 Cal.3d at p. 1164, citing Bus. & Prof. Code, § 6031, subd. (b)).

21

every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed. [Citation.]" (*Keller*, at pp. 12-13.)

*Keller*, *supra*, 496 U.S. 1, nevertheless disagreed with our application of this general principle to the State Bar. The high court explained that "the very specialized characteristics of the State Bar of California . . . serve[] to distinguish it from the role of the typical government official or agency." (*Id*., at p. 12.) These characteristics included the "essentially advisory" nature of the State Bar's responsibilities, and the fact that attorneys, not the general public, provide the bulk of its funding. (*Id*., at p. 11.) The *Keller* court observed, "The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but because they are lawyers." (*Id*., at p. 13.) The court therefore applied to the State Bar a distinction similar to the one recognized in *Abood*, *supra*, 431 U.S. 209: "the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity." (*Keller*, at pp. 13-14.)

### 2. *Glickman*

The present litigation forms part of a continuum of cases that have built upon the holdings in *Abood* and *Keller*. The plaintiffs in these lawsuits have challenged compelled-subsidy programs within the agricultural sector as violating their right to free speech by forcing them to pay for generic advertising to which they object.

22

Initially, the government speech doctrine did not play a large role in this body of litigation, which proceeded on the assumption that these programs funded private, not government speech.  The government speech doctrine was not invoked at all in *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457 (*Glickman*), which rejected a First Amendment challenge to compelled assessments for advertising under marketing orders issued pursuant to the federal Agricultural Marketing Agreement Act of 1937.  (7 U.S.C. § 601 et seq.; see *Glickman*, at p. 482, fn. 2 (dis. opn. of Souter, J.) [observing that the defendant had not argued "that the advertisements at issue represent so-called 'government speech' "].)  Even without the government speech doctrine being interposed, the *Glickman* court upheld the assessments because the charges represented "part of a broader collective enterprise in which [the plaintiffs'] freedom to act independently is already constrained by the regulatory scheme." (*Id.*, at p. 469; see also *id.*, at pp. 473-474, 476-477.)  The court also noted that the marketing orders did not impose any restraint on producers' freedom to communicate any message to any audience, or compel producers to engage in any actual or symbolic speech.  (*Id.*, at pp. 469-471.)  To the *Glickman* court, the plaintiffs' challenge implicated only "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." (*Id.*, at p. 477.)

### 3.  *Gerawan I*

The government speech doctrine was invoked, but only belatedly, in *Gerawan I*, *supra*, 24 Cal.4th 468.  The plaintiff in *Gerawan I* challenged a marketing order issued by the CDFA pursuant to the California Marketing Act.  (*Gerawan I*, at pp. 479-480.)  This order established the California Plum Marketing Board, and required plum growers to finance generic advertising and other activities by the board through an assessment on their produce.  (*Ibid.*)  Comparably to the allegations here, the plaintiff in *Gerawan I* objected to the marketing order on the ground that it required the plaintiff "to fund commercial speech in the form of generic advertising" against its will, with the

23

advertising reflecting " 'viewpoints' " with which the plaintiff " 'vehemently disagree[d].' " (*Id.*, at p. 481.) This directive, the plaintiff argued, violated its rights under both the First Amendment to the United States Constitution and article I, section 2 of the state Constitution. (*Gerawan I*, at p. 480.)

*Gerawan I*, *supra*, 24 Cal.4th 468, followed the United States Supreme Court's decision in *Glickman*, *supra*, 521 U.S. 457, in rejecting the plaintiff's First Amendment claim. (*Gerawan I*, at pp. 507-508.) But with regard to article I, section 2, we determined that "article I's right to freedom of speech, without more, would *not* allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading." (*Id.*, at pp. 509-510.) The plaintiff's allegations were therefore "sufficient at least to implicate its article I right to freedom of speech against the California Plum Marketing Program for compelling funding of generic advertising." (*Id.*, at p. 510.) *Gerawan I* added, however, that "[o]ur conclusion . . . brings no conclusion to this cause. That the California Plum Marketing Program implicates [plaintiff's] right to freedom of speech under article I does not mean that it violates such right." (*Id.*, at p. 517.) Whether the program had that effect was left for determination in subsequent proceedings. (*Ibid.*)

At oral argument in *Gerawan I*, *supra*, 24 Cal.4th 468, amici curiae on behalf of the government sought to characterize the advertisements funded by the program as government speech. (*Id.*, at p. 515, fn. 13.) We rejected this belated effort to inject the government speech doctrine into the case, observing that the plaintiff had not alleged facts within its complaint that, if true, would show that the advertising amounted to government speech, and that the CDFA had not premised its motion for judgment on the pleadings before the superior court on this ground. Amici curiae's arguments to this court were therefore "[t]oo little, too late." (*Ibid.*) Earlier, in discussing the *Glickman* case, *Gerawan I* had described government speech as "somewhat tautologically, speech by the

government itself concerning public affairs" and surmised that this characterization "does not appear to cover generic advertising under a federal marketing order, which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a government agency, as a mechanism of self-regulation by the producers and handlers themselves." (*Id*., at p. 503, fn. 8.)

### 4. *United Foods*

The government speech doctrine also was raised too late to factor into the analysis in *United States v. United Foods, Inc.* (2001) 533 U.S. 405 (*United Foods*), another case that involved the relationship between compelled subsidies for generic advertising and the right to free speech under the First Amendment. In *United Foods*, the court addressed a challenge to mandatory assessments imposed upon mushroom growers pursuant to the Mushroom Promotion, Research, and Consumer Information Act. (7 U.S.C. § 6101 et seq.; hereafter Mushroom Act.) The statute authorized the use of these assessments for "projects of mushroom promotion, research, consumer information, and industry information." (*Id*., § 6104(c)(4).)[12] It was undisputed in *United Foods* that most of the

---

[12] The Mushroom Act was designed to effectuate Congress' policy "to authorize the establishment . . . of an orderly procedure for developing, financing through adequate assessments on mushrooms produced domestically or imported into the United States, and carrying out, an effective, continuous, and coordinated program of promotion, research, and consumer and industry information designed to — [¶] (1) strengthen the mushroom industry's position in the marketplace; [¶] (2) maintain and expand existing markets and uses for mushrooms; and [¶] (3) develop new markets and uses for mushrooms." (7 U.S.C. § 6101(b).)

The statute authorized the Secretary of Agriculture to "propose the issuance of an order," or "an association of mushroom producers or any other person that will be affected by this chapter" to "request the issuance of" an order (7 U.S.C. § 6103(b)(1)), that would, among its terms, provide for a Mushroom Council, constituted of mushroom producers and importers (*id*., § 6104(b)(1)(A)-(B)). This council would "propose, receive, evaluate, approve and submit to the Secretary for approval . . . budgets, plans, and projects of mushroom promotion, research, consumer information, and industry information . . . ." (*Id*., § 6104(c)(4).) Under the Mushroom Act, "[n]o plan or project of promotion, research, consumer information, or industry information, or budget, shall be implemented prior to its approval by the Secretary." (*Id*., § 6104(d)(3).)

25

funds collected through the assessments were used for generic advertising. (*United Foods*, at p. 408.)

In finding that the imposition of these assessments violated the plaintiffs' First Amendment rights, the court in *United Foods*, *supra*, 533 U.S. 405, distinguished *Glickman* on the ground that in the earlier case, "[t]he opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation." (*United Foods*, at p. 412.) The mushroom program, in contrast, did not mandate similar collectivism, and "almost all of the funds collected under the [statute's] mandatory assessments are for one purpose: generic advertising." (*Ibid*.) With "no broader regulatory system in place" concerning subjects other than speech, the court declined to uphold "compelled subsidies for speech in the context of a program where the principal object is speech itself." (*Id*., at p. 415.)

In unsuccessfully defending the assessment program in *United Foods*, *supra*, 533 U.S. 405, the government tardily asserted that the advertising subsidized by the assessments constituted "government speech" that was insulated from the scrutiny that otherwise would adhere under the First Amendment. (*United Foods*, at p. 416.) Because the government had not presented this argument in proceedings below, the Supreme Court declined to address it. (*Ibid*.) The court noted that the government's failure to raise the argument below deprived the plaintiffs of an opportunity "to address significant matters that might have been difficult points for the Government," such as the fact that "although the Government asserts that advertising is subject to approval by the Secretary of Agriculture, respondent claims that the approval is *pro forma*." (*Id*., at pp. 416-417.) This issue and others, the court observed, "would have to be addressed were the program to be labeled, and sustained, as government speech." (*Id*., at p. 417.)

### 5. *Gerawan II*

The brief discussion of government speech in *United Foods*, *supra*, 533 U.S. 405, informed the analysis in *Gerawan II*, *supra*, 33 Cal.4th 1. In *Gerawan II*, we clarified that notwithstanding the constrained view of government speech suggested in *Gerawan I*, *supra*, 24 Cal.4th 468 at page 503, footnote 8, generic advertising produced under the auspices of an agricultural marketing order *could* represent government speech, and on that basis not be subject to heightened scrutiny under article I, section 2.

Among the issues that *Gerawan I*, *supra*, 24 Cal.4th 468, had reserved for further proceedings was the standard or test that would be used to ascertain the lawfulness of compelled funding schemes such as that contained within the California Plum Marketing Program. We addressed this subject in *Gerawan II*, *supra*, 33 Cal.4th 1, which came to this court after another grant of judgment on the pleadings. We determined that under article I, section 2, the constitutionality of the California Plum Marketing Program's financing scheme for advertising would "be tested by the intermediate scrutiny standard articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*)." (*Gerawan II*, 33 Cal.4th at p. 6.)[13]

The decision in *Gerawan II*, *supra*, 33 Cal.4th 1, also acknowledged — the argument now having been properly placed before the court — the government's contention that the marketing program generated government speech. (*Id*., at p. 26.) *Gerawan II* determined that the character of the speech could not be resolved on the

---

[13]    The intermediate scrutiny test "asks (1) 'whether the expression is protected by the First Amendment,' which means that the expression 'at least must concern lawful activity and not be misleading'; (2) 'whether the asserted governmental interest is substantial'; if yes to both, then (3) 'whether the regulation directly advances the governmental interest asserted'; and (4) 'whether it is not more extensive than is necessary to serve that interest.' " (*Gerawan II*, *supra*, 31 Cal.4th at p. 22, quoting *Central Hudson*, *supra*, 447 U.S. at p. 566.)

27

pleadings, but the government would have the opportunity on remand "to prove that the speech at issue was in fact government speech." (*Id*., at p. 27.) It continued, "The kind of showing the government would be required to make has been suggested by the United States Supreme Court," then referenced and quoted the brief discussion of government speech that had appeared in *United Foods*. (*Gerawan II*, at p. 27.) After also reviewing the Supreme Court's analysis of government speech in *Keller*, and observing that "other courts considering the issue have found significant whether the commercial speech in question is attributed to the government or to the agricultural producers" (*Gerawan II*, at p. 28, citing *Cochran v. Veneman* (3d Cir. 2004) 359 F.3d 263, 273-274), we determined, "In the present case, the marketing board is comprised of and funded by plum producers, and is in that respect similar to the State Bar. But, as *United Foods* suggests, the speech may nonetheless be considered government speech if in fact the message is decided upon by the Secretary or other government official pursuant to statutorily derived regulatory authority. Because there are factual questions that may be determinative of the outcome — for example, whether the Secretary's approval of the marketing board's message is in fact pro forma, whether the marketing board is in de facto control of the generic advertising program, and whether the speech is attributed to the government — this issue cannot be resolved on the pleadings and requires further factfinding." (*Gerawan II,* at p. 28.)

6. *Johanns*

Shortly after our decision in *Gerawan II*, *supra*, 33 Cal.4th 1, the United States Supreme Court decided *Johanns*, *supra*, 544 U.S. 550, another First Amendment challenge to a federal program that financed generic advertising for an agricultural product or products through mandatory assessments levied on producers of the commodity.

*Johanns*, *supra*, 544 U.S. 550, involved the Beef Promotion and Research Act of 1985 (Beef Act), which provides for the promotion of "beef and beef products."

28

(7 U.S.C. § 2901(b); *Johanns*, at p. 553.) This statute directs the federal Secretary of Agriculture to advance the statutory goal of promoting the marketing and consumption of beef products by issuing a Beef Promotion and Research Order. (7 U.S.C. § 2903.) Through this order, the Secretary of Agriculture appoints the members of a promotional board (hereafter the Beef Board), comprised of beef producers and importers who have been nominated by trade associations and importers. (*Id.*, § 2904(1).) The Beef Board elects 10 of its members to a Beef Promotion Operating Committee (hereafter Operating Committee), who serve together with 10 representatives named by a federation of state beef councils. (*Id.*, § 2904(4)(A).) The Operating Committee designs promotional campaigns relating to beef, funded by assessments imposed on cattle sales and on the importation of beef products and cattle. (7 U.S.C. § 2904(4)(B) & (C), (8).)[14] As described by the *Johanns* court, these campaigns received substantive review by the Secretary of Agriculture or his or her designee, who approved each project and the content of all promotional materials. (*Johanns*, 544 U.S. at p. 561.) At the time of the *Johanns* decision, many of these materials bore the attribution "Funded by America's Beef Producers." Some also bore the promotional board's logo, consisting of a check mark together with the word "BEEF." (*Id.*, at p. 555.)

---

[14] In describing this promotional speech, the Beef Act provides that "[t]he [Operating] Committee shall develop plans or projects of promotion and advertising, research, consumer information, and industry information, which shall be paid for with assessments collected by the Board. In developing plans or projects, the Committee shall — [¶] (i) to the extent practicable, take into account similarities and differences between certain beef, beef products, and veal; and [¶] (ii) ensure that segments of the beef industry that enjoy a unique consumer identity receive equitable and fair treatment under this chapter." (7 U.S.C. § 2904(4)(B).) These programs are in furtherance of Congress's objective of "carrying out a coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products." (*Id.*, § 2901(b).)

The plaintiffs in *Johanns*, *supra*, 544 U.S. 550, were two associations that represented beef producers. (*Id*., at p. 555.) They alleged that the Beef Act violated the First Amendment by requiring their members to fund generic promotional speech to which they objected. (*Id*., at pp. 556-557.) The high court disagreed. Writing for the court in *Johanns*, *supra*, 544 U.S. 550, Justice Scalia first distinguished earlier precedent as being concerned with the compelled subsidy of *private* speech. "In all of the cases invalidating exactions to subsidize speech," *Johanns* explained, "the speech was, or was presumed to be, that of an entity other than the government itself. [Citations.] Our compelled-subsidy cases have consistently respected the principle that '[c]ompelled support of a private association is fundamentally different from compelled support of government.' [Citation.] 'Compelled support of government' — even those programs of government one does not approve — is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position." (*Id*., at p. 559.)[15]

*Johanns*, *supra*, 544 U.S. 550, then conducted a careful review of the communications generated under the Beef Act, and determined that they represented government speech that was "not susceptible to First Amendment challenge." (*Johanns*, at p. 560.) The court stressed that "[t]he message of the [beef and beef products]

---

**15** *Johanns*, *supra*, 544 U.S. 550, also distinguished between the gravamen of a *compelled-speech* claim and the gist of a *compelled-subsidy* claim as follows: A "compelled-speech argument . . . differs substantively from [a] compelled-subsidy analysis. The latter invalidates an exaction not because being forced to pay for speech that is unattributed violates personal autonomy, but because being forced to fund someone else's private speech unconnected to any legitimate government purpose violates personal autonomy. [Citation.] Such a violation does not occur when the exaction funds government speech. Apportioning the burden of funding government operations (including speech) through taxes and other levies does not violate autonomy simply because individual taxpayers feel 'singled out' or find the exaction 'galling.' " (*Id.*, at p. 565, fn. 8.)

30

promotional campaigns is effectively controlled by the Federal Government itself," being "from beginning to end the message established by the Federal Government." (*Id*., at pp. 560-561.) *Johanns* explained what this effective control entailed. The court observed that the speech was promulgated pursuant to Congressional endorsement of a coordinated program of promotion, " 'including paid advertising, to advance the image and desirability of beef and beef products' " (*id*., at p. 561, quoting 7 U.S.C. § 2901(b)), and that Congress had "specified, in general terms, what the promotional campaigns shall contain . . . and what they shall not." (*Johanns*, at p. 561.) This message was then fleshed out by "an entity [the Operating Committee] whose members are answerable to the Secretary [of Agriculture] (and in some cases appointed by him as well)," with the secretary or his or her designees attending meetings at which advertising proposals were developed, reviewing all promotional messages and even rewriting some of them, and then exercising "final approval authority over every word used in every promotional campaign."[16] (*Johanns*, at p. 561.) *Johanns* summarized, "the beef advertisements are subject to political safeguards *more than adequate* to set them apart from private messages. The program is authorized and the basic message prescribed by federal statute, and the specific requirements for the promotions' content are imposed by federal regulations promulgated after notice and comment. The Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down

---

[16]     To the court in *Johanns*, *supra*, 544 U.S. 550, "[t]his degree of governmental control" distinguished the beef promotion program from the speech involved in *Keller*, *supra*, 496 U.S. 1, in which the State Bar's communicative activities "were not prescribed by law in their general outline and not developed under official government supervision." (*Johanns*, at pp. 561-562.) "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated," *Johanns* observed, "it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." (*Id*., at p. 562.)

to the wording. And Congress, of course, retains oversight authority, not to mention the ability to reform the program at any time. No more is required." (*Id.*, at pp. 563-564, fns. omitted, italics added.)

In upholding the federal beef promotion program, *Johanns*, *supra*, 544 U.S. 550, rejected the contentions that the subsidized advertisements could not represent government speech because they were "funded by a targeted assessment on beef producers, rather than general revenues" (*id.*, at p. 562), and were not explicitly attributed to the state but rather, in at least some instances, to " 'America's Beef Producers' " (*id.*, at p. 564). The court deprecated an attribution requirement, whereby promotional speech funded by targeted assessments would have to be explicitly ascribed to the state in order to satisfy the First Amendment, as a "highly refined elaboration" of constitutional jurisprudence that represented an unprecedented and clumsy response to the question before the court: "the correct focus is not on whether the ads' audience realizes the Government is speaking, but on the compelled assessment's purported interference with respondents' First Amendment rights." (*Johanns*, at p. 564, fn. 7.) At root, the court concluded, plaintiffs "enjoy no right not to fund government speech — whether by broad-based taxes or targeted assessments, and whether or not the reasonable viewer would identify the speech as the government's."[17] (*Johanns*, at p. 564, fn. 7.)

---

[17] In dissent, Justice Souter argued that the targeted nature of the assessments on beef and beef products — with funding coming only from producers, and not from the general public fisc — dictated a more constrained construction of the government speech doctrine. (*Johanns*, *supra*, 544 U.S. at pp. 575-576 (dis. opn. of Souter, J.).) To Justice Souter, "the relative palatability of a remote subsidy shared by every taxpayer is not to be found when the speech is funded with targeted taxes. For then, as here, the particular interests of those singled out to pay the tax are closely linked with the expression, and the taxpayers who disagree with it suffer a more acute limitation on their presumptive autonomy as speakers to decide what to say and what to pay for others to say." (*Ibid.*)

These circumstances, Justice Souter believed, meant that for the Beef Act's promotional messaging to qualify as government speech, the challenged advertisements had to disclose that the government was the speaker. Such a requirement was needed, he

*Johanns*, *supra*, 544 U.S. 550, did acknowledge that "[i]f the viewer would identify the speech as [that of plaintiffs' members], however, the analysis would be different." (*Id*., at p. 564, fn. 7.) In explaining this caveat, *Johanns* speculated that "[o]n some set of facts," an adequately supported allegation that the advertisements were in fact attributed to beef producers might provide grounds for an as-applied challenge to the beef promotion program, framed under a compelled-speech theory. (*Id*., at p. 566; see also *Wooley v. Maynard* (1977) 430 U.S. 705 (*Wooley*); *Barnette*, *supra*, 319 U.S. 624.) Yet the court did not perceive any basis in the record for concluding that the plaintiffs' members in fact would be associated with advertisements bearing the text, "America's Beef Producers." This tagline alone, the court concluded, was not "sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad." (*Johanns*, at p. 566.)

### 7. Post-Johanns *Case Law Involving Compelled Subsidies and the Government Speech Doctrine*

Since *Johanns* was decided, its analysis has been applied in several cases to rebuff free speech challenges to compelled-subsidy programs. (E.g., *Paramount Land Co. LP v. California Pistachio Com'n* (9th Cir. 2007) 491 F.3d 1003, 1009-1012 (*Paramount Land*); *Avocados Plus Inc. v. Johanns* (D.D.C. 2006) 421 F.Supp.2d 45, 50-54; *Cricket Hosiery, Inc. v. U.S.* (Ct. Internat. Trade 2006) 429 F.Supp.2d 1338, 1343-1348.) Two particularly pertinent decisions are discussed below.

---

wrote, "to ensure that the political process can practically respond to limit the compulsion" associated with the funding scheme. (*Johanns*, *supra*, 544 U.S. at p. 576 (dis. opn. of Souter, J.).) It meant "nothing that Government officials control the message if that fact is never required to be made apparent to those who get the message, let alone if it is affirmatively concealed from them. . . . Unless the putative government speech appears to be coming from the government, its governmental origin cannot possibly justify the burden on the First Amendment interests of the dissenters targeted to pay for it." (*Id*., at pp. 578-579, fns. omitted.)

a. *Delano Farms Co.*

In parallel federal litigation over the very assessments that are at issue here, the United States Court of Appeals for the Ninth Circuit determined that the Commission's promotional messaging represented government speech and that the Ketchum Act's compelled-subsidy program therefore did not violate the First and Fourteenth Amendments. (*Delano Farms Co. v. California Table Grape Com'n*, *supra*, 586 F.3d at pp. 1228-1230.) The Court of Appeals' analysis first applied the framework set forth in *Lebron v. National Railroad Passenger Corporation* (1995) 513 U.S. 374 (*Lebron*) for ascertaining whether an entity is a government actor for First Amendment purposes, and determined therefrom that the Commission was a government entity that could generate government speech on its own.[18] (*Delano Farms Co. v. California Table Grape Com'n*, at p. 1226.) Although one member of the appellate panel would have stopped there (*id*., at p. 1230 (conc. opn. of Reinhardt, J.)), the remaining judges also concluded that "the Commission's activities are effectively controlled by the State of California, also rendering them government speech" (*id*., at p. 1226). On this point, the majority emphasized that with the Ketchum Act, "[t]he California Legislature was quite specific about its expectations for the Commission and its messaging" (*id*., at p. 1228); that the Secretary of the CDFA appoints and can remove all members of the Commission; and

---

[18] The plaintiff in *Lebron*, *supra*, 513 U.S. 374, alleged that Amtrak had violated his First Amendment rights by rejecting a billboard display because of its political content. (*Id*., at p. 378.) In its ruling below, the federal court of appeals had determined that Amtrak was not a government entity. (*Ibid*.) The United States Supreme Court reversed, concluding that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." (*Id*., at p. 394.) Phrasing its ultimate holding more broadly, the high court held that "where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." (*Id*., at p. 400.)

that the state may audit the Commission's books, records, and accounts (*id.*, at pp. 1228-1229).

The Ninth Circuit in *Delano Farms Co. v. California Table Grape Com'n*, *supra*, 586 F.3d 1219, acknowledged some differences between the regime established by the Ketchum Act and the federal beef promotion program upheld in *Johanns* — most notably, in the court of appeals' view, the fact that CDFA personnel do not review and approve advertisements prepared by the Commission, whereas United States Department of Agriculture officials were directly engaged with the advertising copy involved in *Johanns*. (*Delano Farms Co. v. California Table Grape Com'n*, at p. 1229.) The court of appeals nevertheless considered these differences insufficient to invalidate the Ketchum Act's compelled-subsidy program on First Amendment grounds. (*Id.*, at p. 1230.)

b. *Gallo Cattle*

In *Gallo Cattle Co. v. Kawamura* (2008) 159 Cal.App.4th 948 (*Gallo Cattle*), the court adopted *Johanns*'s analysis of government speech in rejecting a challenge brought under article I, section 2 to the compelled-subsidy provisions of a CMA marketing order for milk. (*Gallo Cattle*, at pp. 959-963.) In doing so, the Court of Appeal disagreed with the plaintiff's argument that under the state Constitution, subsidized communications must be expressly attributed to the state to qualify as government speech.[19] The court expressed skepticism "that . . . a special disclosure requirement would, as a practical matter, provide a significantly greater assurance that . . . speech will be subject to effective democratic checks." (*Gallo Cattle*, at p. 963.) The plaintiff in *Gallo Cattle* also asserted that the subsidized speech "drown[ed] out" its own voice, and violated its right

---

[19] Although some advertisements produced under the marketing order involved in *Gallo Cattle*, *supra*, 159 Cal.App.4th 948, "included taglines identifying the [Milk Producers Advisory] Board as an instrumentality of the State of California," these "taglines appear[ed] very briefly in the advertisements, too briefly to alert the average viewer to the fact that the commercials are being presented on behalf of a government agency." (*Id.*, at p. 955.)

to free speech for that reason.  (*Id.*, at p. 966; see also *Miller v. California Com. on Status of Women* (1984) 151 Cal.App.3d 693, 702 (*Miller*) [explaining that activities upheld by the court as government speech did not have the effect of drowning out dissenting voices].)  The Court of Appeal determined that for government speech to implicate constitutional safeguards under a "drowning out" rationale, "the government [must] speak in such a way as to make private speech difficult or impossible, such that opponents do not truly have the opportunity to communicate their views even to those who might wish to hear them."  (*Gallo Cattle*, at pp. 967, 966.)  With the plaintiff in *Gallo Cattle* admitting that it could present its own viewpoint to the public, the court concluded that the government's communications did not have this sort of effect.  (*Ibid.*)

**D.  Synthesis**

The foregoing authorities establish certain basic principles relevant to the analysis here.

First, the case law reflects an evolving understanding of how the government speech doctrine relates to a compelled-subsidy claim.  Notwithstanding some skeptical language in *Gerawan I*, *supra*, 24 Cal.4th at page 503, footnote 8, it is now established that speech generated through a compelled-subsidy program in which market participants are involved in the development of the messaging may represent government speech. (See *Gerawan II*, *supra*, 33 Cal.4th at pp. 27-28.)

Second, we have looked toward federal precedent interpreting the First Amendment for guidance regarding the government speech doctrine's bearing on a compelled-subsidy claim brought under article I, section 2.  (*Gerawan II*, *supra*, 33 Cal.4th at pp. 27-28.)  Consistent with this approach, we regard the majority opinion in

36

*Johanns* as persuasive, and we adopt its reasoning as applicable to compelled-subsidy claims brought under article I, section 2.[20]  (See *Beeman*, *supra*, 58 Cal.4th at p. 341.) We construe *Johanns*, and other high court pronouncements regarding government speech, as centrally concerned with the presence or absence of the requisite indicia of government responsibility for and control over the substantive content of these communications, reflecting political accountability for their overall message.  (See, e.g., *Johanns*, *supra*, 544 U.S. at pp. 560-561; *Gerawan II*, *supra*, 33 Cal.4th at pp. 27-28.)  In some instances — such as standard communications by "a governor, a mayor, or a state tax commission" (*Keller*, *supra*, 496 U.S. at p. 11) — speech may be recognized as that of the government without extended analysis.  In other scenarios, such as with the speech involved in *Gerawan II* and *Johanns*, a more comprehensive inquiry may be necessary to ascertain whether the requisite degree of governmental control and, thus, political accountability exist.

Third, when addressing a challenge to a compelled-subsidy program, if such issues are appropriately raised and developed by the plaintiff the court's analysis also must consider whether the state's actions impact free speech rights in a manner distinct from the bare fact of the subsidy requirement itself.  In *Johanns*, *supra*, 544 U.S. 550, for example, the court implied that a different standard of review could apply to the subsidy program if the advertisements it generated were attributed to the plaintiffs' members. (*Id*., at p. 566; see also *Walker*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2246] ["the Free

---

[20]    The government speech doctrine can provide a framework for analyzing a broad variety of First Amendment claims.  Among them, it is sometimes perceived as an alternative to conventional forum analysis.  (See, e.g., *Walker*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at pp. 2251-2252]; *Summum*, *supra*, 555 U.S. at pp. 469-470.)  Invocation of the government speech doctrine in lieu of a forum analysis, or in other settings, may implicate considerations under article I, section 2 that are different from those associated with the doctrine's application in this case.  The discussion here should not be construed as expressing a view concerning the applicability of the government speech doctrine in contexts not involving compelled subsidies.

Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech"]; *Wooley*, *supra*, 430 U.S. at p. 717; *Barnette*, *supra*, 319 U.S. at p. 642.)  Likewise, *Gallo Cattle*, *supra*, 159 Cal.App.4th 948, and other decisions suggest that government speech might warrant heightened scrutiny if its exercise made "private speech difficult or impossible." (*Id*., at p. 966; see also *Miller*, *supra*, 151 Cal.App.3d at p. 702; *NAACP v. Hunt* (11th Cir. 1990) 891 F.2d 1555, 1566 ["the government may not monopolize the 'marketplace of ideas,' thus drowning out private sources of speech"]; *Warner Cable Communications, Inc. v. City of Niceville* (11th Cir. 1990) 911 F.2d 634, 638 ["the government may not speak so loudly as to make it impossible for other speakers to be heard by their audience"].)

### E.  Application to the Ketchum Act

Application of these principles to the Ketchum Act leads to the conclusion that promotional messaging under the statute is subject to sufficient governmental direction and control to qualify as government speech.  The Legislature has developed, and endorsed the dissemination of, the central message promulgated by the Commission.  This message communicates a specific view (promotion) regarding a single commodity (California fresh grapes).  The articulation and broadcasting of this message has been entrusted in the first instance to market participants, but only acting through an entity, the Commission, that is subject to meaningful oversight by the public and other government actors.  This oversight includes mechanisms that serve to ensure that the Commission's messaging remains within the parameters set by statute.  These circumstances establish that the communications involved here represent government speech for purposes of article I, section 2.

Recognition of the promotional messaging produced under the Ketchum Act as government speech follows, first, from the Act's findings and charge to the Commission.  As observed *ante*, in enacting this statute the Legislature found that "[i]t is . . . necessary

38

and expedient in the public interest to protect and enhance the reputation of California fresh grapes for human consumption in intrastate, interstate and foreign markets" (§ 65500, subd. (e)), and "[t]he promotion of the sale of fresh grapes for human consumption by means of advertising . . . is . . . in the interests of the welfare, public economy and health of the people of this state" (*id*., subd. (f)).  The Act thus expressly endorses the promulgation of advertising and similar speech that promotes California fresh grapes as a general category.  Consistent with these findings, the Act gives the Commission, upon becoming operational, the power *and* the duty "[t]o promote the sale of fresh grapes by advertising and other similar means for the purpose of maintaining and expanding present markets and creating new and larger intrastate, interstate, and foreign markets for fresh grapes; to educate and instruct the public with respect to fresh grapes; and the uses and time to use the several varieties, and the healthful properties and dietetic value of fresh grapes."  (§ 65572, subd. (h).)  These provisions leave no doubt that the state, through the Ketchum Act, has prescribed in advance the basic message to be promulgated — the promotion of California table grapes — and selected the Commission as a messenger.[21]

Moreover, in creating the Commission as a public corporation, the Legislature further aligned the state with the message to be articulated.  Public corporations "are

---

[21]    It is true that the Commission only initiated operations upon an affirmative vote among growers.  (§ 65573.)  But the fact that the Legislature has, through this mechanism, given market participants a say in determining how the message prescribed by the Act will be promulgated is not fatal to the characterization of the Commission's communications as government speech.  (See *Gerawan II*, *supra*, 33 Cal.4th at p. 26.)  Likewise, although plaintiffs emphasize language within the Act providing that commissioners drawn from the state's fresh grape producers "are intended to represent and further the interest of a particular agricultural industry concerned" (§ 65576), the Act immediately adds, consistent with its general findings explaining the state's interest in the promotion of California fresh grapes, "that such representation and furtherance is intended to serve the public interest" (*ibid*.).  Given the totality of the relevant circumstances, neither of these provisions connote that the Commission's speech is somehow private speech.

organized for the purpose of carrying out the purposes of the [L]egislature in its desire to provide for the general welfare of the state, and in the accomplishment of which legislative convenience or constitutional requirements have made them essential." (*In re Madera Irrigation District* (1891) 92 Cal. 296, 317 [describing municipal corporations]; see also *State Bar of California v. Superior Court* (1929) 207 Cal. 323, 329-332 [determining that the Legislature could designate the State Bar as a non municipal public corporation].) Many such corporations, such as school districts (see *Gateway Community Charters v. Spiess* (2017) 9 Cal.App.5th 499, 507), fulfill quintessentially governmental functions.

Of course, public corporations are not invariably regarded as units of the government for purposes of the government speech doctrine. The high court's analysis and decision in *Keller*, *supra*, 496 U.S. 1, discussed *ante*, instruct as much. We need not and do not decide here whether the Commission is, on its own, a state actor capable of producing government speech. At a minimum, however, the relevant circumstances here distinguish this case from *Keller* in that they underscore greater overall state responsibility for the message being communicated by the public corporation at issue. In *Keller*, the high court regarded the State Bar as having essentially advisory responsibilities, and there was no prior legislative charge that directed the State Bar to advance a specific viewpoint in its messaging. (*Keller*, at p. 11; see also *Johanns*, *supra*, 544 U.S. at pp. 561-562 [distinguishing *Keller*].) Those facts could be understood as diminishing the state's responsibility and accountability for the State Bar's communications, even granting that entity's status as a public corporation. Here, by comparison, the Legislature's prior specification of the central message to be communicated by the Commission, and its selection of the Commission as messenger, leave no doubt that the Commission, as a public corporation, echoes and advances a viewpoint endorsed by the state as it undertakes its duties.

Furthermore, the Commission operates subject to several statutes generally applicable to state agencies (see Gov. Code, § 11000, subd. (a)) that permit ongoing review of its operations and help ensure accountability for its actions. These laws include the Public Records Act (Gov. Code, § 6250 et seq.; see *id.*, § 6252, subd. (f)(1)),[22] the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.; see *id.*, § 11121, subd. (a)), and the Political Reform Act (Gov. Code, § 81000 et seq.; see *id.*, § 82049). The Ketchum Act also demands that the Commission "keep accurate books, records and accounts of all of its dealings, which . . . shall be open to inspection and audit by the Department of Finance . . . or other state officer." (Food & Agr. Code, § 65572, subd. (f).) These obligations all facilitate ongoing oversight of the Commission's activities, guarding against any deviation from statutory directives.

The Ketchum Act also incorporates an avenue for the Secretary to correct specific departures from the statutory message. Through the Act's appeal mechanism, the Secretary may reverse an action by the Commission if it is the subject of an appeal and she finds that it was "not substantially sustained by the record, was an abuse of discretion, or illegal." (§ 65650.5.) Were the Commission to endorse a message not authorized under the statute, or regarded as an abuse of discretion, an aggrieved party could challenge this action through an appeal. Although this case does not require us to identify the precise parameters of the Secretary's authority to reverse Commission actions, it stands to reason that speech that patently would *not* promote the sale of California table grapes could become the subject of a viable challenge. And regardless of whether such an appeal leads to reversal, the Secretary could be held politically accountable for the outcome. Although this review mechanism is somewhat different from the oversight responsibilities borne by the CDFA with other compelled-subsidy programs (see footnote 3, *ante*), it nonetheless

---

[22] Section 65603 exempts from the Public Records Act information obtained by the Commission from shippers. (See also Gov. Code, § 6276.08.)

provides a meaningful avenue for ensuring that the Commission's messaging remains within the parameters crafted by the Legislature.

Other provisions within the Ketchum Act also underscore the state's responsibility for and control over messaging promulgated under the statute. Among them, the Act gives the Secretary of the Department of Food and Agriculture the duty to appoint commissioners from the set of nominees for each position on the Commission. (§§ 65555, 65563, 65575.1.) Having this power, the Secretary is in a weakened position to disclaim responsibility for promotional messaging that an appointee later may approve. Furthermore, as the officer who appoints the commissioners, the Secretary also has the power to remove them from office. (See *People ex rel. Atty. Gen. v. Hill* (1857) 7 Cal. 97, 102.) By statute, commissioners serve a term of years (§ 65555), which may circumscribe the Secretary's authority to remove them from office (see Gov. Code, § 1301 ["Every office, the term of which is not fixed by law, is held at the pleasure of the appointing power"]; *Brown v. Superior Court* (1975) 15 Cal.3d 52, 55; *Boyd v. Pendegast* (1922) 57 Cal.App. 504, 507 ["Appointments to hold during the pleasure of the appointing power may be terminated at any time and without notice; appointments to continue 'during good behavior,' or for a fixed term of years, cannot be terminated except for cause"]). Consistent with such a limitation, the parties have stipulated only that the Secretary may remove a commissioner "if necessary." Nevertheless, even a qualified power of removal provides another means of oversight by the Secretary, who is herself appointed by and holds office at the pleasure of the Governor. (Food & Agr. Code, § 102.)

In sum, the Commission was created by statute and given a specific mission to, among other things, promote in a generic fashion a particular agricultural product. In order for the promotional material of a body like the Commission to be considered government speech under an " 'effectively controlled' " theory (*Johanns, supra*, 544 U.S. at p. 560), the government must have the authority to exercise continued control over the message sufficient to ensure that the message stays within the bounds of the relevant

42

statutory mandate. The foregoing review of the totality of the relevant circumstances reveals such authority, and the resulting governmental accountability for the Commission's messaging. Moreover, nothing in the record suggests that the Commission has departed from its mission. In reaching the determination that the government effectively controlled the Commission's speech, we do not suggest that the specific indicia of government responsibility and control that appear here are essential to a finding of government speech in any compelled-subsidy case brought under article I, section 2. We simply conclude that, even acknowledging that the Commission is constituted primarily of market participants and that the Ketchum Act grants the Commission some latitude in articulating the viewpoint prescribed by law, the facts and law relevant to this case amply establish that the speech plaintiffs challenge is government speech.

Plaintiffs identify perceived deficiencies in the statutory scheme and its implementation that, in their view, prevent us from characterizing the subsidized communications as government speech. First, plaintiffs read the discussion of government speech in *Gerawan II*, *supra*, 33 Cal.4th at pages 27-28, as committing this court to the position that the Secretary or her staff must review Commission-approved advertisements in order for these materials to constitute government speech. Such review, plaintiffs stress, did not occur here.

Plaintiffs' position rests on a misreading of *Gerawan II*. That decision described conditions that might provide an adequate basis for concluding that advertising produced under a CMA marketing order constituted government speech. (*Gerawan II*, *supra*, 33 Cal.4th at pp. 27-28.) But these conditions were not presented as, nor can they be fairly regarded as, invariably necessary elements for the recognition of government speech.[23]

---

[23] Furthermore, an advisory board constituted under the CMA, the subject of our decision in *Gerawan II*, *supra*, 33 Cal.4th 1, is not necessarily situated identically to the Commission for purposes of generating government speech. Unlike the Ketchum Act, the CMA, on its own, does not direct the promotion of any specific agricultural

Instead, the significance of these and other factors within a particular dispute over subsidized speech lies in their relationship to foundational issues of governmental control and accountability. Put another way, although participation by an executive officer or their staff in the development of promotional messaging can be relevant to the recognition of government speech, the absence of such engagement is not necessarily determinative of this issue. (See *Paramount Land*, *supra*, 491 F.3d at p. 1011.) Where, as here, the circumstances surrounding the development and dissemination of subsidized speech adequately establish government responsibility for and control over the messaging involved, a statutory scheme's failure to add a prophylactic layer of review by an executive officer is of no constitutional consequence. Even without line-by-line perusal by the CDFA, sufficient safeguards exist here for the promotional speech subsidized under the Act to be regarded as government speech. If the public, including an aggrieved grower, seeks to correct an errant articulation of the Ketchum Act's message, or replace the persons responsible for this message, avenues exist to accomplish these goals.

Plaintiffs advance a similarly flawed interpretation of *Johanns*, *supra*, 544 U.S. 550. There, the facts pertinent to a finding of government speech included the Secretary of Agriculture's review and approval of "every word" of the promotional materials at issue. (*Id*., at p. 561.) But *Johanns* did not cast review and approval by an appointed executive officer or his or her staff as an absolute prerequisite for communications to represent government speech, regardless of other pertinent circumstances. (See *Paramount Land*, *supra*, 491 F.3d at p. 1011 ["*Johanns* did not set a floor or define

---

commodity. Instead, as discussed *ante*, the CMA allows the Secretary to issue marketing orders that pertain to specific commodities. (§ 58741.) These orders may then contain terms calling for subsidized generic advertising. (§ 58889.) Market participants, acting through an advisory board, "administer" the terms of the order, "[s]ubject to the approval of the [Secretary]." (§ 58846, subd. (a).) Given these provisions, the facts most pertinent to a finding that a CMA marketing order generates government speech may be somewhat different from those most relevant to an evaluation of the Commission's speech under the Ketchum Act.

minimum requirements" for application of the government speech doctrine].) Quite the opposite is true: the *Johanns* court regarded the political safeguards involved with the Beef Act as "more than adequate" to distinguish the challenged advertisements from private speech. (*Johanns*, at p. 563.) Likewise here, our review of the totality of the relevant circumstances establishes that the government has sufficient responsibility for and control over the Commission's messaging for these communications to represent government speech, even without direct participation by CDFA staff in the development of particular articulations of the statutory message.

Plaintiffs also ask this court to read into article I, section 2 a requirement that, to qualify as government speech, subsidized communications must on their face be specifically and explicitly attributed to the government. Plaintiffs claim that such disclosures, as urged by Justice Souter in his dissent in *Johanns*, *supra*, 544 U.S. 550, are necessary to ensure that reasonable observers will appreciate that the communications come from the state and can hold the government accountable for this messaging. Here, plaintiffs assert, the failure of the Commission's advertising to affirmatively disclose the state as the speaker forecloses the prospect that these communications represent government speech. But the court in *Johanns* rejected a categorical attribution requirement as unnecessary (*id*., at p. 564, fn. 7), and plaintiffs provide no persuasive reason to adopt a different rule under article I, section 2. We agree that, when present, the fact that advertising or other communications are explicitly credited to the government may be relevant to a finding of government speech. Yet, as detailed *ante*, the totality of the circumstances pertinent to the generation of speech under the Ketchum Act incorporates sufficient mechanisms to ensure governmental accountability for this messaging, even without such ascription. (See *Gallo Cattle*, *supra*, 159 Cal.App.4th at p. 963 [questioning the marginal utility of an express disclosure requirement].)

In short, the generation of speech under the Ketchum Act is attended by sufficient indicia of government responsibility and control for these communications to properly be regarded as government speech.

## F. Consequences of Classification as Government Speech

Having determined that promotional messaging under the Ketchum Act represents government speech, it remains to consider the consequences of this designation.

The court in *Johanns*, *supra*, 544 U.S. 550, described government speech as "exempt" from scrutiny under the First Amendment. (*Johanns*, at p. 553.) Consistent with this view, and given the absence of a viable compelled-speech claim in that case, the *Johanns* court regarded its conclusion that the Beef Act subsidized only government speech as dispositive of the First Amendment claim before it.

We conclude that a similar result holds under article I, section 2. By itself, a state directive to pay taxes or fees to fund only government speech does not implicate, let alone infringe upon, protected free speech rights. As the court in *Johanns*, *supra*, 544 U.S. 550, observed, " 'Compelled support of government' — even those programs of government one does not approve — is of course perfectly constitutional, as every taxpayer must attest" (*id.*, at p. 559), meaning that subsidized government speech is "not susceptible to First Amendment challenge" on the bare ground that the subsidy requirement, by itself, violates the plaintiff's right to free speech (*id.*, at p. 560).

Of course, a determination that state action generates only government speech does not, by itself, necessarily address all of its possible constitutional implications. If the Ketchum Act's compelled-subsidy provisions did more than merely direct plaintiffs to fund government speech, additional analysis might be required under article I, section 2. (Accord, *Johanns*, *supra*, 544 U.S. at p. 564, fn. 7.) But plaintiffs have not shown that the statute, as implemented, has any effect on their constitutional right to exercise free speech.

46

For example, although at oral argument counsel for plaintiffs asserted that the Commission's promotional speech effectively prevents his clients from communicating their preferred message, the record below does not reveal a triable issue of fact on this point. (See *Gallo Cattle*, *supra*, 159 Cal.App.4th at p. 967; *Miller*, *supra*, 151 Cal.App.3d at p. 702.) Similarly, the record yields no basis for a triable claim that the Ketchum Act forges such a close connection between plaintiffs and the Commission's promotional speech that it conveys, inaccurately, their endorsement of the views expressed in these communications. (Cf. *Johanns*, *supra*, 544 U.S. at p. 565, fn. 8 [describing the character of a compelled-speech claim]; *Wooley*, *supra*, 430 U.S. 705; *Barnette*, *supra*, 319 U.S. 624.) On the contrary, the generic slogan "Grapes from California" does not convey a specific connection to plaintiffs, who are merely five of the approximately 475 producers of fresh grapes in this state. Any argument that the Commission's advertisements are attributable to plaintiffs, or to producers of California table grapes in general, is even weaker here than the parallel contention was in *Johanns*, *supra*, 544 U.S. 550. There, the challenged advertisements were credited to "America's Beef Producers," yet the court regarded this reference as not "sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad." (*Id.*, at p. 566.)

Plaintiffs' contentions, as developed in the record, thus sound solely in a fundamental objection to subsidizing speech with which they disagree. This being the case, the determination *ante* that the Ketchum Act generates only government speech disposes of plaintiffs' claims under article I, section 2.[24]

---

[24] Our resolution of the government speech issue makes it unnecessary to address the Commission's alternative argument that the Ketchum Act's speech-generating provisions satisfy intermediate scrutiny under article I, section 2.

### III. DISPOSITION

We affirm the judgment of the Court of Appeal.

**CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**RAMIREZ, J.***
**AARON, J.****

_____

\* Presiding Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

\*\* Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Delano Farms Company v. California Table Grape Commission
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 235 Cal.App.4th 967
**Rehearing Granted**

_____

**Opinion No.** S226538
**Date Filed:** May 24, 2018
_____

**Court:** Superior
**County:** Fresno
**Judge:** Donald S. Black

_____

**Counsel:**

Brian C. Leighton; Sagaser, Watkins & Wieland, Howard A. Sagaser; Kirkland & Ellis, Michael W. McConnell and Danielle R. Sassoon for Plaintiffs and Appellants.

Benbrook Law Group, Bradley A. Benbrook and Stephen M. Duvernay for The Cato Institute, Institute for Justice and Reason Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Jenner & Block, Rick Richmond, Jessica Ring Amunson and Samuel C. Birnbaum for DKT Liberty as Amicus Curiae on behalf of Plaintiffs and Appellants.

Baker, Manock & Jensen, Robert D. Wilkinson; Wilmer Cutler Pickering Hale and Dorr, Seth P. Waxman, Brian M. Boynton, Thomas G. Saunders, Francesco Valentini, Ari Holtzblatt, Thomas G. Sprankling and Franceso Valentini for Defendant and Respondent.

Kamala D. Harris, Attorney General, Janill L. Richards, Acting State Solicitor General, Mark J. Breckler, Chief Assistant Attorney General, Linda Gándara, Deputy State Solicitor General, Robert W. Byrne, Assistant Attorney General, Kathleen Vermazen Radez, Associate Deputy State Solicitor General, Randy L. Barrow and Ali A. Karaouni, Deputy Attorneys General, for California Department of Food and Agriculture as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael W. McConnell
Kirkland & Ellis
655 15th Street NW, #1200
Washington D.C.  20005
(202) 879-5000

Seth P. Waxman
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania Avenue, NW
Washington, D.C.  20006
(202) 663-6800